In re APPORTIONMENT OF STATE LEGISLATURE—1964.

MARCH 5, 1964.

1. STATES—APPORTIONMENT OF LEGISLATURE—DEFERRAL OF ACTION.
Action by State Supreme Court in matter of determining which submitted plan for apportionment and districting of senate and house of representatives conforms most nearly to constitutional requirements is deferred until April 15, 1964, pending decisions by the supreme court of the United States pertaining to legislative apportionment as affected by the equal protection clause of the Constitution of the United States, an issue of controlling importance herein (US Const, Am 14; Mich Const 1963).

APRIL 10, 1964.

2. SAME—APPORTIONMENT OF LEGISLATURE—EQUAL DIVISION OF COURT.
Matter of determining which submitted plan for apportionment and districting of senate and house of representatives conforms most nearly with constitutional requirements is not as yet resolved, the Supreme Court being equally divided between present final determination and deferral of action; SOURIS, J., rejecting all submitted plans as unconstitutional because of inequalities in population in representative districts; O'HARA, J., joining DETHMERS and KELLY, JJ., in favoring adoption of the Hanna-Huhtala-LaPorte-Brucker plan submitted by some members of the legislative apportionment commission; KAVANAGH, C. J., and BLACK and ADAMS, JJ., deferring decision during pendency of cases in supreme court of the United States relating to legislative apportionment; and SMITH, J., for deferment until approximately May 15, 1964.

MAY 26, 1964.

3. SAME—LEGISLATIVE APPORTIONMENT—ADOPTION AND PUBLICATION OF PLAN.
Apportionment and districting of the senate and house of representatives whereby 38 senators are to be elected from single member districts pursuant to a formula weighting 80% to population factors and 20% to area factors and whereby 110 representatives are to be elected from single member districts with population as nearly equal as may be, as set forth in

REFERENCES FOR POINTS IN HEADNOTES
[1–3] 18 Am Jur, Elections § 13 et seq.; § 24 (Supp).

newly-adopted State Constitution, pursuant to plan of apportionment and districting submitted by half of the members of constitutional commission on legislative apportionment, and which had been previously directed to be adopted and published by DETHMERS, KELLY, and O'HARA, JJ., as complying most nearly with constitutional requirements and not invalid under the equal protection clause of the Constitution of the United States, is now directed to be adopted and published, with SMITH and ADAMS, JJ., concurring in result so as to provide orderly operation of the election processes, but with reservation as to constitutionality under the Federal Constitution (US Const, Am 14; Const 1963, art 4, §§ 2-6).

Four original petitions by various members of the commission on legislative apportionment, filed under the provision of the Constitution of 1963, submitting proposed apportionment plans for the State legislature, one petition and plan by Ivan E. Brown, one petition and plan by Henry J. Dongvillo, one petition and plan by William F. Hanna, Ralph Huhtala, Alfred O. LaPorte, and Wilber M. Brucker, and one petition and plan by Richard H. Austin and A. Robert Kleiner. Submitted March 3, 1964. (Calendar No. 95, Docket No. 50,705.) Opinions filed March 5, 1964, and decision deferred until April 15, 1964. Opinions filed April 10, 1964, deferring action. See p 461 *et seq.* Opinions filed May 26, 1964, directing adoption and publication of plan. See p 480. See, also, 373 Mich 247, 250.

DETHMERS, J. (*dissenting*). The powers of this Court derive from the Michigan Constitution of 1963. Article 6, § 4, confers upon it power to issue, hear, and determine prerogative and remedial writs and appellate jurisdiction. The exercise of any of that power or jurisdiction is not here to be undertaken because this matter was not initiated or brought and, hence, has no existence under the authority of article 6, but only that of article 4 hereinafter considered.

Before this Court are proposed plans for apportionment and districting of the Michigan senate and house of representatives, submitted by members of the commission on legislative apportionment, under the provisions of the seventh paragraph of section 6 of article 4 of the Constitution, because of inability of a majority of that commission to agree on a plan. The sole function, power and duty of this

Court in the premises, as in that article, section and paragraph prescribed, is to "determine which plan complies most accurately with the constitutional requirements."

What are the constitutional requirements for districting and apportioning the Michigan legislature? Pertinent provisions of article 4, §§ 2, 3, 4, 5, and 6, read as follows:

*"Senators, number, term.*

"Sec. 2. The senate shall consist of 38 members to be elected from single member districts at the same election as the governor for four-year terms concurrent with the term of office of the governor.

*"Senatorial districts, apportionment factors.*

"In districting the State for the purpose of electing senators after the official publication of the total population count of each Federal decennial census, each county shall be assigned apportionment factors equal to the sum of its percentage of the State's population as shown by the last regular Federal decennial census computed to the nearest one-one hundredth of one percent multiplied by four and its percentage of the State's land area computed to the nearest one-one hundredth of one percent.

*"Apportionment rules.*

"In arranging the State into senatorial districts, the apportionment commission shall be governed by the following rules:

"(1) Counties with 13 or more apportionment factors shall be entitled as a class to senators in the proportion that the total apportionment factors of such counties bear to the total apportionment factors of the State computed to the nearest whole number. After each such county has been allocated one senator, the remaining senators to which this class of counties is entitled shall be distributed among such counties by the method of equal proportions applied to the apportionment factors.

"(2) Counties having less than 13 apportionment factors shall be entitled as a class to senators in the

proportion that the total apportionment factors of such counties bear to the total apportionment factors of the State computed to the nearest whole number. Such counties shall thereafter be arranged into senatorial districts that are compact, convenient, and contiguous by land, as rectangular in shape as possible, and having as nearly as possible 13 apportionment factors, but in no event less than 10 or more than 16. Insofar as possible, existing senatorial districts at the time of reapportionment shall not be altered unless there is a failure to comply with the above standards.

"(3) Counties entitled to two or more senators shall be divided into single member districts. The population of such districts shall be as nearly equal as possible but shall not be less than 75 percent nor more than 125 percent of a number determined by dividing the population of the county by the number of senators to which it is entitled. Each such district shall follow incorporated city or township boundary lines to the extent possible and shall be compact, continguous, and as nearly uniform in shape as possible.

*"Representatives, number, term; contiguity of districts.*

"Sec. 3. The house of representatives shall consist of 110 members elected for two-year terms from single member districts apportioned on a basis of population as provided in this article. The districts shall consist of compact and convenient territory contiguous by land.

*"Representative areas, single and multiple county.*

"Each county which has a population of not less than seven-tenths of one percent of the population of the State shall constitute a separate representative area. Each county having less than seven-tenths of one percent of the population of the State shall be combined with another county or counties to form a representative area of not less than seven-tenths of one percent of the population of the State. Any county which is isolated under the initial allo-

cation as provided in this section shall be joined with that contiguous representative area having the smallest percentage of the State's population. Each such representative area shall be entitled initially to one representative.

*"Apportionment of representatives to areas.*

"After the assignment of one representative to each of the representative areas, the remaining house seats shall be apportioned among the representative areas on the basis of population by the method of equal proportions.

*"Districting of single county area entitled to 2 or more representatives.*

"Any county comprising a representative area entitled to two or more representatives shall be divided into single member representative districts as follows:

"(1) The population of such districts shall be as nearly equal as possible but shall not be less than 75 percent nor more than 125 percent of a number determined by dividing the population of the representative area by the number of representatives to which it is entitled.

"(2) Such single member districts shall follow city and township boundaries where applicable and shall be composed of compact and contiguous territory as nearly square in shape as possible.

*"Districting of multiple county representative areas.*

"Any representative area consisting of more than one county, entitled to more than one representative, shall be divided into single member districts as equal as possible in population, adhering to county lines.

*"Annexation or merger with a city.*

"Sec. 4. In counties having more than one representative or senatorial district, the territory in the same county annexed to or merged with a city between apportionments shall become a part of a contiguous representative or senatorial district in the city with which it is combined, if provided by ordinance of the city. The district or districts with

which the territory shall be combined shall be determined by such ordinance certified to the secretary of State. No such change in the boundaries of a representative or senatorial district shall have the effect of removing a legislator from office during his term.

*"Island areas, contiguity.*

"Sec. 5. Island areas are considered to be contiguous by land to the county of which they are a part.

*"Commission on legislative apportionment.*

"Sec. 6. A commission on legislative apportionment is hereby established consisting of eight electors, four of whom shall be selected by the State organizations of each of the two political parties whose candidates for governor received the highest vote at the last general election at which a governor was elected preceding each apportionment. If a candidate for governor of a third political party has received at such election more than 25 percent of such gubernatorial vote, the commission shall consist of 12 members, four of whom shall be selected by the State organization of the third political party. One resident of each of the following four regions shall be selected by each political party organization: (1) the upper peninsula; (2) the northern part of the lower peninsula, north of a line drawn along the northern boundaries of the counties of Bay, Midland, Isabella, Mecosta, Newaygo and Oceana; (3) southwestern Michigan, those counties south of region (2) and west of a line drawn along the western boundaries of the counties of Bay, Saginaw, Shiawassee, Ingham, Jackson and Hillsdale; (4) southeastern Michigan, the remaining counties of the State.  *  *  *

*"Call to convene; apportionment; public hearings.*

"Within 30 days after the adoption of this Constitution, and after the official total population count of each Federal decennial census of the State and its political subdivisions is available, the secretary

of State shall issue a call convening the commission not less than 30 nor more than 45 days thereafter. The commission shall complete its work within 180 days after all necessary census information is available. The commission shall proceed to district and apportion the senate and house of representatives according to the provisions of this Constitution. All final decisions shall require the concurrence of a majority of the members of the commission. The commission shall hold public hearings as may be provided by law.

*"Apportionment plan, publication; record of proceedings.*

"Each final apportionment and districting plan shall be published as provided by law within 30 days from the date of its adoption and shall become law 60 days after publication. The secretary of State shall keep a public record of all the proceedings of the commission and shall be responsible for the publication and distribution of each plan.

*"Disagreement of commission; submission of plans to Supreme Court.*

"If a majority of the commission cannot agree on a plan, each member of the commission, individually or jointly with other members, may submit a proposed plan to the Supreme Court. The Supreme Court shall determine which plan complies most accurately with the constitutional requirements and shall direct that it be adopted by the commission and published as provided in this section.

*"Jurisdiction of Supreme Court on elector's application.*

"Upon application of any elector filed not later than 60 days after final publication of the plan, the Supreme Court, in the exercise of original jurisdiction, shall direct the secretary of State or the commission to perform their duties, may review any final plan adopted by the commission, and shall remand such plan to the commission for further

action if it fails to comply with the requirements of this Constitution."

It will be noted in said seventh* paragraph that "If a majority of the commission cannot agree on a plan, each member of the commission, individually or jointly with other members, may submit a proposed plan to the Supreme Court" and "The Supreme Court shall determine which plan complies most accurately with the constitutional requirements". This does not contemplate apportioning or districting by this Court or even its picking and choosing of parts of 1 plan together with portions of others submitted by the commissioners. Determination is to be made as to which 1 of the plans submitted by commissioners for apportioning and districting the Michigan legislature complies, not exactly but most accurately. Having so determined, we are to direct the commission to adopt that plan.

As will be observed from a perusal of the above quoted constitutional requirements, the steps to be taken in districting and apportioning the State for electing 38 senators are:

(1) To assign to each county apportionment factors (hereinafter called factors) equal to the sum of its percentage of the State's population, multiplied by four, and its percentage of the State's land area; (This gives rise to the term "80–20 formula"; that is to say, the components of a county's factor total consist 80% in population and 20% in area.)

(2) To place counties having 13 or more factors in 1 class which shall be entitled to senators in the proportion that the total of factors of that class bears to the total of factors of the State; (There are 5 such counties, thus entitled, as a class, to a total of 18 of the State's 38 senators.)

---

* Fourth paragraph quoted of section 6.—REPORTER.

(3) To allocate 1 senator to each of such counties in that class and then distribute the remaining senators to which the counties in that class are entitled among those counties by the method of equal proportions applied to factors;

(4) To divide the counties thus entitled to 2 or more senators into single member districts with populations as nearly equal as possible, with a permissible variance from such population equality of not less than 75% nor more than 125% of a number determined by dividing the total population of the county by the number of senators to which it is entitled. These districts shall follow incorporated city or township lines to the extent possible and shall be compact, *contiguous,* and as nearly uniform in shape as possible;

(5) To place counties having less than 13 factors in another class which shall be entitled to senators in the proportion that the total of factors of that class bears to the total of factors of the State; (There are 78 counties in this class which is entitled to 20 senators.)

(6) To arrange the counties of the latter class into districts that are compact, convenient and *contiguous by land,* as rectangular in shape as possible and having as nearly as possible 13 factors, but in no event less than 10 nor more than 16 factors. Insofar as possible, existing senatorial districts at the time of reapportionment shall not be altered unless there is a failure to comply with the above standards.

The method for districting and apportioning for the election of 110 members of the house follows:

(1) Divide the counties in 2 classes, first those having .7% or more of the State population (20 counties) and, second, those counties having less than .7% of the State's population (63);

(2) Each county of the first class shall constitute a separate representative area.

(3) Counties of the second class shall be combined to form separate representative areas having not less than .7% of the State population. The districts shall consist of compact and convenient territory *contiguous by land.*

(4) A representative shall be assigned to each representative area.

(5) After assignment of 1 representative to each representative area, the remaining house seats shall be apportioned among the representative areas on the basis of population by the method of equal proportions.

(6) Counties entitled to 2 or more representatives shall be divided into single member districts as follows:

a. Of as nearly equal population as possible, with a variance permissible of not more than 125% or less than 75% of a number determined by dividing the area's population by the number of representatives to which it is entitled.

b. Which shall follow city and township boundaries where applicable and be composed of compact and *contiguous* territory as nearly as possible square in shape.

(7) Representative areas consisting of more than 1 county, entitled to more than 1 representative, shall be divided into single member districts as equal as possible in population, adhering to county lines.

We are advised that failure of a majority of the commission to agree on a plan resulted, at least in part, from differences as to interpretation of the constitutional requirements for districting and apportioning. Included among the differences were the following:

(1) Whether, in the creation of senatorial districts consisting of more than 1 county, the paramount

criterion is, (a) to cause each to have as nearly as possible 13 factors or, (b) to leave unaltered, insofar as possible, senatorial districts existing at the time of reapportionment so long as they stay within the 10 to 16 factor range?

The applicable language of subsection 2 of section 2 requires that such districts have as nearly as possible 13 factors, with permissible deviations not to exceed the range of from 10 to 16 factors. This discloses an intent that coming as nearly as possible to 13 factors is to be preferred over coming at a figure further from 13 even though within the permitted range of deviation. In the order of appearance in the subsection 2, the commission is to try first for 13 or as near thereto as possible. Thereafter, insofar as possible, says the concluding sentence of subsection 2, the commission shall try to retain existing districts unaltered unless not compatible with compliance with the previously stated standards, including, of course, that of staying as closely as possible to 13 factors. Furthermore, it is to be noted that elsewhere in article 4 the term "apportionment" is uniformly used. Only in the noted sentence of subsection 2 of section 2 is the word "reapportionment" employed, indicating that the provision for leaving existing senatorial districts, insofar as possible, unaltered has prospective application to reapportionments subsequent to the initial apportionment under this article. This would evidence an intent that once the senate districting and apportioning has been accomplished under the factors formula of article 4, apportionment commissioners should not thereafter be permitted to redistrict, willy-nilly, perhaps unseating incumbents thereby, unless a changed factors situation should require it. We hold that, certainly as to this initial apportionment, and as well to subsequent reapportionments, prior consideration must be given to ar-

ranging the multicounty senatorial districts so that each has as nearly as possible 13 factors before looking to the possibility of leaving existing districts unaltered.

(2) Whether the northern and southern peninsulas of Michigan are "contiguous by land" within the meaning of article 4?

It is to be observed that the terms "contiguous" and "contiguous territory" are used in providing for dividing counties entitled to 2 or more senators or representatives into single member districts. When providing, however, for arranging or combining counties, not entitled to 1 or more senators, into districts the term "contiguous by land" is employed, as it is also in the first paragraph of section 3, presumably applicable to combining of counties into single member representative districts. The difference in the 2 situations seems to reflect the recognition that counties may be traversed by rivers or other bodies of water but no county is partly in the northern peninsula and partly in the southern peninsula. The use of the term "contiguous by land" only with respect to combining and arranging 2 or more counties into single member senator or representative districts, and not with respect to dividing counties into districts, reveals the intent to refer only to the waters separating the 2 peninsulas and not to rivers or waters within counties and, hence, only to prevent combining counties on opposite sides of the straits of Mackinac into single member senatorial or representative districts. It is said that the erection of the Mackinac bridge and the adoption of the constitutional requirement that no person shall be denied the equal protection of the laws which allegedly would result from "gross distortions of population between districts" occasioned by "a separation at the straits" have served, in effect, to make the 2 peninsulas contiguous by land within the meaning of article 4. Although the bridge is re-

ferred to by the commissioners proposing this theory as "Mighty Mac" and the "equal protection of the laws" provisions of both Federal and State Constitutions are being accorded constantly expanding force and application, it would hardly seem that either the bridge construction or the noted constitutional language has served to move the 2 peninsulas one whit closer together. They remain contiguous, still, by water, not by land.

(3) Whether, in the division of multidistrict counties with respect to which it is required that, where applicable or to the extent possible, incorporated city and township boundary lines shall be followed, account is to be taken of annexations of township territory into cities after the date of the Federal decennial census, April 1, 1960? This language speaks as of the time the districting and apportioning is being done by the commission, not some antecedent date. In our opinion, the lines in effect at that time are the ones to be followed.

(4) Whether the commission's (or this Court's) concept of the equal protection of the laws provision of article 1, § 2, must or may be applied to the apportioning and districting process so as to circumvent or change the express provisions and requirements of article 4? As noted at the outset, we are not now in the exercise of our usual judicial powers stemming from article 6, § 4, and, accordingly, it is not open to us in this matter to determine Federal constitutional questions, as in *Scholle* v. *Secretary of State,* 367 Mich 176, but only to perform the office specified for us in the seventh paragraph of article 4, § 6. Our assignment is to determine which one of the plans submitted to us by the members of the commission complies most accurately *"with the constitutional requirements."* If it be suggested that the test thus laid down for us is broader than that of the immediately succeeding eighth paragraph in which, at the

application of any elector, we review any final plan
and remand it to the commission for further action
"if it fails to comply with the *requirements of this
Constitution*", it can only be concluded that action
under the seventh paragraph is but a practice round,
inconclusive, because it is subject to final review and
remand, under the eighth paragraph, if the plan fails
to comply with *the requirements of this Constitution*.

What are "the requirements of this Constitution"
governing districting and apportioning the legis-
lature? They are those prescribed in article 4, as
above reviewed. It is said, however, that because
article 4, § 6, paragraph 7, lays down the broader
test of which plan complies most accurately "with
the constitutional requirements" or, as stated in
paragraph 8, "with the requirements of this Con-
stitution" and not the expressly stated narrower
one of compliance with the requirements of article
4, it follows that the broader test was intended, in-
asmuch as it would have been simple and easy to
have worded it to express the narrower test of com-
pliance with article 4 if that had been intended. In
this connection it is also said that nowhere in the
Constitution of 1963 is it stated that the terms "con-
stitutional requirements" or "requirements of this
Constitution" mean or are limited in their meaning
to article 4 requirements. This is simply not correct.
The third paragraph of article 4, § 2, in providing
for arrangement of districts, reads in part, "* * *
the apportionment commission shall be governed by
the following rules". Section 2 of article 1 does not
follow but precedes this. There do follow all of the
above quoted provisions of article 4 setting forth
rules in detail to be used for the purpose of appor-
tioning and districting. Nowhere else in the Con-
stitution are any rules set forth which are therein
stated to be for that purpose. After section 2 of
article 4 thus directs the commission to follow the

rules stated in article 4, then section 6 of that article, in its fifth paragraph, requires the commission to proceed to district and apportion the senate and house "according to the provisions of this Constitution". There being no other provisions in the Constitution referring to legislative apportionment or stating how it is to be done, the conclusion cannot be escaped that the "constitutional requirements" referred to means the only requirements in the Constitution expressly directing how the districting and apportioning is to be done, namely, those in article 4.

Realizing that in the instant proceedings the authority of this Court to consider whether article 4 formulas deny equal protection of the laws, if permissible at all, must come from our assignment under article 4 to determine which plan complies most accurately with the constitutional requirements, the commissioners who are urging such consideration upon us (Austin and Kleiner), say that article 1, § 2, is a part of the "constitutional requirements" test to be applied. With this we disagree for reasons already stated. These commissioners say that the factors plan required by the specific provisions of article 4, with the so-called 80–20 formula for districting the State and apportioning for the election of senators and the not less than .7% of population formula for districting and apportioning for election of representatives would result in gross disparity in the population of the several districts and thus constitute a denial of the equal protection of the laws in violation of the general provisions of article 1, § 2. They concede at this point that "In the normal situation the general requirement gives way to the extent necessary to allow the specific requirement to be fulfilled." This is, undoubtedly, the law. They contend, however, that this is not the normal situation. They see here one calling for following the general requirement as they see it, and,

though they seem reluctant to wholly admit this, abandoning the specific requirement accordingly. They then proceed, in their submitted plan, to delete the 2 formulas and to substitute a straight population formula for the 80-20 factor formula for fixing senatorial districts and for house districts remove the .7% figure stated in article 4 and replace it with one of their own making, .91%, which they say is the resultant "quotient" arrived at by dividing 100% of population by 110, the number of representatives to be in the house. If ever there was an attempt to render a constitutional mandate utterly meaningless, this is it. The express and detailed districting and apportioning directions set forth in article 4 could better, under such short shrift, have been omitted altogether by the framers.

If there were a conceivable conflict between the general declaration of rights in article 1, § 2, and the specific requirements of article 4, and we are satisfied there is not, this manifestly would be a case in which the general should yield to the specific. Not this Court, but the members of the commission are empowered and directed, by the language of article 4, to district and apportion. There is no other language for that purpose in the Constitution. By the express terms of article 4 the commissioners are told precisely how to do it. They are not authorized by the Constitution to determine whether article 4 or any portion thereof is unconstitutional under either the Federal or State Constitution or at variance with some other portion of the latter. Neither is that included within our assignment which comes exclusively from that article. Ours is but to determine which plan submitted by commissioners complies most accurately with those constitutional requirements specifically set forth by article 4 for observance by the commissioners. How clear it is from all this that the constitutional convention

delegates, and the people in adopting the Constitution, never intended that districting and apportioning should be other than as in article 4 provided. This is equally clear from debates of the convention. Article 1, § 2, was debated as a part of the declaration of rights and as a safeguard of civil rights against discrimination on racial or religious grounds. Apportionment or districting for election of legislators was not so much as mentioned in debates thereon. On the other hand, debates on article 4 were vigorous, extended and they highlighted, above everything else in importance in that connection, the "80–20" formula and the "not less than .7%" formula, leaving it beyond peradventure that their inclusion in the article and their adoption was not through inadvertence, but by informed, reasoned, well-considered, and express design. The convention's address to the people and the public press, radio, and television explained in detail to the people, before the election of adoption, the meaning of article 4 and districting and apportionment under it. Thus, the people were fully informed of its meaning. Not once was it then publicly said that article 1, § 2, would override article 4 and require apportioning on a straight population basis in both houses. The framers and adopters had no intention that article 1, § 2, was to supersede or overrule article 4. As well say that the requirement of article 2, § 1, that a citizen must be 21 years of age to vote is superseded by the equal protection clause of article 1, § 2, because the Court does not deem the over age of 21 years classification to be reasonable and considers citizens of 18 years of age equally competent to vote and, hence, that they have been denied equal protection of the laws. It is ludicrous to even imagine that it was the intent of the constitutional framers and adopters to create a legislative apportionment commission empowered to district and apportion, in utter disregard of the

requirements of article 4 and in any manner which they might think, with this Court's agreement, would comply with the commission's or this Court's concept of equal protection of the laws. Inasmuch as the intent and purpose of the delegate-framers and the people in adopting the Constitution is so manifest, the language quoted with approval by Mr. Justice Black in his controlling opinion in *Bacon* v. *Kent-Ottawa Metropolitan Water Authority,* 354 Mich 159, 176, is particularly apt. It reads as follows:

"Constitutions do not change with the varying tides of public opinion and desire; the will of the people therein recorded is the same inflexible law until changed by their own deliberative action; and it cannot be permissible to the courts that in order to aid evasions and circumventions, they shall subject these instruments, which in the main only undertake to lay down broad general principles, to a literal and technical construction, as if they were great public enemies standing in the way of progress, and the duty of every good citizen was to get around their provisions whenever practicable, and give them a damaging thrust whenever convenient. They must construe them as the people did in their adoption, if the means of arriving at that construction are within their power."

So, too, in *John Hancock Mutual Life Insurance Co.* v. *Ford Motor Co.,* 322 Mich 209, 221, 222, this Court said:

"Here we are not confronted with a statute which must be strictly construed, but rather with a constitutional provision, a part of our fundamental organic law, which should be given a reasonable and practical interpretation which gives effect to the intent and purpose of its framers and the persons who adopted it. Words used therein are to be given their natural, obvious and ordinary meanings and not a technical meaning."

In *Romano* v. *Auditor General,* 323 Mich 533, 538, 539, the Court said:

"May we conclude that the people, in amending article 5, § 9,* incorporated into the Constitution language which they intended should have no meaning, purpose or effect? We quote with approval from *State, ex rel. Jameson,* v. *Denny,* 118 Ind 382, 391 (21 NE 252, 4 LRA 79).

" 'It is not to be supposed that a single word was inserted in the organic law of the State without the intention of conveying thereby some meaning.' "

The United States supreme court stated the rule applicable here in *Billings* v. *United States,* 232 US 261, 282 (34 S Ct 421, 58 L ed 596):

"It is also settled beyond dispute that the Constitution is not self-destructive. In other words, that the powers which it confers on the one hand it does not immediately take away on the other; that is to say, that the authority to tax which is given in express terms is not limited or restricted by the subsequent·provisions of the Constitution or the amendments thereto, especially by the due process clause of the Fifth Amendment. *McCray* v. *United States,* 195 US 27 (24 S Ct 769, 49 L ed 78), and authorities there cited."

To accept the mentioned construction causing article 1, § 2, to overthrow article 4, or most of its vitals at least, would make the Constitution, to borrow from *Billings,* self-destructive.

From materials submitted by Commissioners Hanna, Huhtala, LaPorte, and Brucker, objecting to the Austin-Kleiner plan, we quote with approval the following:

"In summary, the Austin-Kleiner argument must be rejected because:

---

* Const 1908, amended in November 1948 election.—REPORTER.

"1. It would require the exercise of 'a power to remake constitutional provisions which the Constitution has not given to the courts.'

"2. It would deny to the clear language of article 4, any meaning, purpose, or effect, and, as stated by Mr. Chief Justice Marshall, 'such a construction is inadmissible.'

"3. It would render the Constitution 'self-destructive.'

"4. It would not give effect to the intent and purpose of the framers of the Constitution and the persons who adopted it, but would be directly contrary to that intent and purpose."

"The Austin-Kleiner plan is objectionable because:

"1. It does not even purport to comply with the constitutional requirements spelled out in detail in article 4.

"2. It deliberately ignores the limited and entirely administrative function of the Court in this matter, and seeks to convert it into an adversary proceeding between litigants, to try issues which are not and cannot be before this Court.

"3. It asks the Court to destroy whole sections of the Constitution adopted by the people of this State in 1963."

Accordingly, we reject the Austin-Kleiner plan because, so far from accurately complying with, it is completely and avowedly violative of, article 4 requirements which, we hold, must control.

Being satisfied, because of the origin and nature of this proceeding, that the merits of the equal protection of the laws question is not properly before us for decision in this matter, and that, therefore, it ought not to be considered, nevertheless, anticipating the possibility of a contrary view, we would touch on it briefly. *Scholle* v. *Secretary of State, supra,* is not authority for the proposition that the formulas of article 4 are unconstitutional as a denial of equal protection of the laws. *Scholle* was predicated on

the position that there was no rational basis for the senatorial apportionment provisions of the 1952 State constitutional amendment, then before the Court, which involved population disparities between the several districts. Mr. Justice KAVANAGH quoted (p 185) one of the delegates to the State constitutional convention to the effect that the 1952 amendment did not follow any plan but was simply an arbitrary freezing in of various districts. Justice KAVANAGH found that the amendment lacked a rational, reasonable, uniform or even ascertainable nondiscriminatory purpose. It is otherwise with the article 4 plan of the new Constitution. Here there is a uniform, ascertainable, nondiscriminatory plan and purpose which is rational and reasonable. As stated in the material of commissioners supporting it:

"The senate '80–20' formula reflects the differing economic and social interests of Michigan citizens, such as the following:

"(1) The concentration of heavy industry in the southern lower peninsula and of light manufacturing in the southwestern and western lower peninsula;

"(2) the agricultural interest of the out-state;

"(3) the concentration of mining in the upper peninsula;

"(4) the concentration of logging and wood products in the upper peninsula and the upper portion of the lower peninsula;

"(5) the concentration of large economic and business interests in the southern portion of the lower peninsula.

"Also, there are the differing economic activities in each section. The economic interests of Michigan are divergent. Therefore, the problems of each section differ. The apportionment formula affords the people of all parts of Michigan the representation necessary for a fair opportunity to express their distinctive needs. The 'equal protection' clause does not compel this Court to ignore the fact that the

needs of the Houghton county miners are funda-
mentally different from those of Wayne county tool
and die makers. Each person is not a digit, whose
right to an adequate voice in the legislature depends
solely upon the extent of the population concentra-
tion of the area in which he lives."

Delegate Dr. John Hannah, president of Michigan
State University, during debate before the constitu-
tional convention said:

"The committee, after a good deal of thought, came
to the conclusion—and I am sure the committee was
correct—that the best interests of this State are
going to be served if 1 house of the legislature is
apportioned on some basis other than straight popu-
lation. The committee decided that it would be the
senate that would be apportioned on some basis
other than straight population. It then gave consid-
eration to what factors should be given consider-
ation: obviously area was 1 factor. The suggestion
was made and it would be appropriate to take into
consideration economic interests because of the
diversity of interests in some areas. And there were
other suggestions. Finally, because of the difficulty
of identifying anything but area, the committee con-
cluded that area and population were the only fac-
tors that it could recommend to this convention."

"It's based 80% on population and 20% on area
because it is a fact that it is fairer and more nearly
in the best interests of the state to make certain that
there are a reasonable number of senators repre-
senting that vast geographic area in the upper penin-
sula, a reasonable number representing that vast
area in the northern half of the lower peninsula."

It follows that Justices of this Court who signed the
controlling opinions in *Scholle* are not, by reason
thereof, constrained to adopt the Austin-Kleiner
position here.

Attention is drawn to the recent decision of the
United States supreme court in *Wesberry* v. *Sanders,*

376 US 1 (84 S Ct 526, 11 L ed 2d 481) 32 LW 4142. The court held a Georgia statute districting and apportioning Georgia for election of members to the United States congress invalid because the population of 1 district thereunder is grossly out of balance with that of the other 9 congressional districts of that State. This was predicated on the proposition that article 1, § 2, of the United States Constitution, provided for election, by the people of the several States, of congressmen on a population basis and that they should be apportioned among the several States according to their respective numbers. The views expressed were buttressed by statements of delegates to the national constitutional convention made during debates on the subject. The Fourteenth Amendment's guarantee of equal protection of the laws was not made the basis for the decision. The case is not authority for the proposition that both houses of a State legislature must be apportioned on a straight population basis or that failure to do so works a denial to persons of equal protection of the laws.

Likewise, mention has been made of Gray v. Sanders, 372 US 368 (83 St Ct 801, 9 L ed 2d 821). In that case the court held invalid Georgia's county unit system as a basis for counting votes in a democratic primary election for the nomination of a United States senator and statewide officers. It was said that the practical effect of the system is that the vote of each citizen for those statewide officers counts for less and less as the population of his county increases. The discrimination there complained of was the relative weighting or diluting of the votes of different electors casting their votes for the same statewide office. As Mr. Justice Stewart, joined by Mr. Justice Clark, said in their concurrence with the court's opinion (pp 381, 382):

"This case does not involve the validity of a State's apportionment of geographic constituencies from which representatives to the State's legislative assembly are chosen, nor any of the problems under the equal protection clause which such litigation would present. We do not deal here with 'the basic ground rules implementing *Baker* v. *Carr,* 369 US 186 (82 S Ct 691, 7 L ed 2d 663).' This case, on the contrary, involves statewide elections of a United States senator and of State executive and judicial officers responsible to a statewide constituency. Within a given constituency, there can be room for but a single constitutional rule—one voter, one vote. *United States* v. *Classic,* 313 US 299 (61 S Ct 1031, 85 L ed 1368)."

Thus *Gray* is equally as inapplicable as *Wesberry* to the matter before us.

In *MacDougall* v. *Green,* 335 US 281, 283, 284 (69 S Ct 1, 93 L ed 3) the court said:

"To assume that political power is a function exclusively of numbers is to disregard the practicalities of government. * * * It would be strange indeed, and doctrinaire, for this court, applying such broad constitutional concepts as due process and equal protection of the laws, to deny a State the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former."

In Colorado the electors, in 1962, adopted a constitutional amendment, providing for house apportionment on population basis and a senate apportionment which was more largely on an area than population basis. In *Lisco* v. *Love* (DC Colo), 219 F Supp 922, 931, 932, the court said of this, the following:

· "The highest ratio, that of districts Nos. 11 and 12 over district No. 23, is 3.6 to 1.

"The heterogeneous characteristics of Colorado justify geographic districting for the election of the members of 1 chamber of the legislature. In no other way may representation be afforded to insular minorities. Without such districting the metropolitan areas could theoretically, and no doubt practically, dominate both chambers of the legislature.

"The plaintiffs make much of the disparities in senatorial representation which vary downward from 3.6 to 1. They say that the deviations from per capita standards are impermissible. We do not agree. The distributive scheme of amendment No. 7 may not be perfect but it does recognize the geographic diversities, the historic grouping of counties, and the accessibility of a candidate to the voters and of a senator to his constituents. The realities of topographic conditions with their resulting effect on population may not be ignored. * * *

"The contention that the voters have discriminated against themselves appalls rather than convinces."

Also, at this point, it is helpful to keep in mind that in Michigan, as distinguished from the Tennessee situation discussed in *Baker* v. *Carr,* 369 US 186 (82 S Ct 691, 7 L ed 2d 663), the right of initiative and referendum is reserved to the people by the 1963 Constitution, thus affording them an opportunity for correction and relief whenever a majority of them shall determine that present article 4 formulas deny equal protection of the laws.

In *Nolan* v. *Rhodes* (DC SD Ohio), 218 F Supp 953, the court, after noting that in Ohio the senate is apportioned, in substance, by population and the house by area and population, said (p 958):

"Ohio's constitutional apportionment takes into account the varying interests of its citizens engaged in different occupations in the 88 counties of the State. It reflects a determination of the people to

give representation to each of the counties even though some of them are thinly populated."

In *Germano* v. *Kerner* (DC ND Ill), 220 F Supp 230, the court described Illinois' senatorial districts as being on an area basis, and said (p 232):

"The result is obvious, the one voter-one vote ratio is neither sought or desired and of course is not attained. The figures, graphs and statistics set forth in plaintiffs' complaint correctly and unequivocally depict a clear picture of population disparities in State senatorial districts. Dividing the State's population, 10,081,133, by the number of senatorial districts, 58, we find that if such districts were to be based on population, there should be 173,812 voters * * * in each district. Such is not the case. By way of illustration the average district in the city of Chicago has some 196,994 voters; the remainder of Cook county excluding Chicago averages 263,000 voters per district. Moreover, within Chicago itself, as well as 'down-state', discrepancies exist in relative district population figures. And finally, unlike the lower house no reapportionment or redistricting is provided for.

"Plaintiffs' complaint alleges that the above discriminates against certain voters, particularly against those such as themselves who live in metropolitan as opposed to rural areas. This fact can hardly be denied. However, I am of the opinion that these conditions do not constitute, as contended by plaintiffs' complaint, even an unreasonable much less an invidious discrimination as prohibited by the Fourteenth Amendment."

No reported decision of any court has held that failure to apportion both houses of a State legislature on a straight population basis constitutes a denial of the equal protection of the laws, much less that apportionment on a rational basis and under a reasonable plan for protection of all of the State's interests, peoples and areas, as prescribed by article

4 of the Michigan Constitution, is invalid. We say that it is not.

Because, therefore, on the merits of the equal protection question article 4 is valid and because that is not properly a question for determination by the commission in the performance of its duly assigned task or by this Court in this matter, we reiterate that the Austin-Kleiner plan, being grossly violative of article 4, is not entitled to consideration. It cannot be said to be the one which complies most accurately therewith. It must be rejected.

Three other plans have been submitted by commissioners. Each of these purports to follow article 4 requirements as interpreted by their respective formulators, without benefit of emasculation by article 1, § 2, considerations. We proceed to their consideration to determine which complies most accurately with the article 4 requirements.

First is that of Commissioner Brown. For apportionment of senate seats he adheres to the interpretation that maintaining existing districts unaltered is a prime requisite superior to the criterion of making each district as nearly as possible possessed of 13 factors. We have already expressed our disapproval of that interpretation. For house apportionment he adopts the plan of Commissioner Dongvillo, one we shall discuss later.

Commissioners Hanna, Huhtala, LaPorte, and Brucker submit the so-called Hanna plan. It most accurately complies with article 4 formulas and requirements, both as to senate and house districting and apportionment. It is in accord with our above expressed views (1) as to the primacy of the criterion of 13 factors as nearly as possible over that of retaining existing districts, (2) that the 2 peninsulas are not contiguous by land, (3) that changed city and township boundaries caused by annexations since the 1960 census should be followed, and (4) that

article 4 requirements alone control without modification by article 1, § 2, considerations.

Commissioner Dongvillo also has submitted a plan, the expressed theory of which is similar to that of the Hanna plan. That brings us to a consideration of criteria so far not discussed in this opinion. These are that with respect to senatorial districts created by combining counties, they shall be "compact, convenient, and contiguous by land, as rectangular in shape as possible"; that with respect to senatorial districts carved out of a single county, they "shall follow incorporated city or township boundary lines to the extent possible and shall be compact, contiguous, and as nearly uniform in shape as possible"; and that with respect to house districts they "shall consist of compact and convenient territory contiguous by land" and "be composed of compact and contiguous territory as nearly square in shape as possible". These may be termed antigerrymandering provisions. Viewing the Brown, Dongvillo, and Hanna plans in the light of these criteria, we are persuaded that the Hanna plan is the 1 of the 3, or for that matter, of the 4 submitted, that complies most accurately therewith. The same is to be said with respect to the requirements that senatorial districts formed by combining counties shall have as nearly as possible 13 factors, that senatorial districts formed by dividing a county shall be as nearly equal in population as possible, that representative areas formed by combining counties shall have house seats apportioned to them on the basis of population, and that representative districts formed by dividing a county shall be as nearly equal in population as possible. The overall statewide picture regarding these requirements show the Hanna plan to be in the most accurate compliance therewith of any of the plans. As previously stated, we do not pick parts and parcels.

For all of the above reasons we determine that the Hanna plan for senatorial and representative districting and apportionment, statewide and in the several areas, most accurately complies with the constitutional requirements referred to in the seventh paragraph of article 4, § 6, of the Michigan Constitution of 1963. The Hanna plan, herein approved, consists of the following for senate apportionment:

| | |
|---|---|
| Statewide | Senate Plan No. 6 |
| Genessee county | Senate Plan No. 1 |
| Macomb county | Senate Plan No. 2 |
| Oakland county | Senate Plan No. 6 |
| Wayne county | Senate Plan No. 4 |

and the following for house of representatives apportionment:

| | |
|---|---|
| Statewide house plan | No. 9 |
| Bay county house plan | No. 2 |
| Berrien county house plan | No. 1 |
| Calhoun county house plan | No. 4 |
| Genessee county house plan | No. 6 |
| Ingham county house plan | No. 4 |
| Jackson county house plan | No. 1 |
| Kalamazoo county house plan | No. 3 |
| Kent county house plan | No. 10 |
| Macomb county house plan | No. 4 |
| Muskegon county house plan | No. 4 |
| Oakland county house plan | No. 7 |
| Saginaw county house plan | No. 3 |
| St. Clair county house plan | No. 2 |
| Washtenaw county house plan | No. 4 |
| Wayne county house plan | No. 8 |

KELLY, J., concurred with DETHMERS, J.

O'HARA, J. I concur in major substance with the carefully considered opinion of Mr. Justice DETHMERS and for the reasons he has therein assigned. Specifically: I reject the Austin-Kleiner plan as

being violative of the plain mandate in article 4 to apportion and district in accordance with the terms of that article. I reject the Brown plan as over-weighing the maintenance of existing senatorial districts. I reject the contention that the upper and lower peninsulas are contiguous by land within the meaning of the 1963 Constitution. I do not consider *Scholle* v. *Secretary of State,* 367 Mich 176, as being applicable herein for the reason that a completely new instrument, the 1963 Constitution, containing a rational plan with specifically weighted factors was not therein judicially construed. Excepting the previous holding upon the contiguity of the peninsulas by land, I consider the Hanna-Huhtala-LaPorte-Brucker plan and the Dongvillo plan as both being in substantial compliance with article 4.

It is, however, a fact of judicial life that since *Baker* v. *Carr*\* the validity of any plan of legislative apportionment and districting is federally justiciable. Cases impend before the United States supreme court, decisions in which may reasonably be expected to furnish guide lines in the assessment of the constitutionality of the factor formulae in the 1963 Constitution. By waiting a reasonable period, not beyond April 15, 1964, such guide lines may be furnished by the Federal supreme court. By reason of this possibility I am constrained to join in the deferment of our final action until that date. It is my present conviction that the factor formulae of the 1963 Michigan Constitution do not offend against the only test thus far set down by *Baker* v. *Carr,* or any other United States supreme court decision specifically touching on State bicameral legislative apportionment and districting. The weighted factors, in my view do not constitute invidious discrimination. On April 15, 1964, I shall address myself to an evaluation of the Hanna, et al. and Dongvillo plans

---

\* *Baker* v. *Carr,* 369 US 186 (82 S Ct 691, 7 L ed 2d 663).

to the end that I shall have requited my obligation under article 4, as I conceive it, determining which plan complies most accurately with constitutional requirements.

Memorandum of Justice Black.

At the outset our function should be declared with unmistakable clarity. Called upon as it is to proceed under paragraph 7 (quoted in the margin[1]), this Court has before it a task of construction and application only. No question of validity—Federal or otherwise—of all or any part or portion of the Constitution of 1963 need be considered. For the purposes of proceedings under said paragraph 7 we should accept each word and phrase of the Constitution of 1963 as having been validly adopted by the people. We should, nevertheless, take care to make plain that the National equality clause must be taken into coequal if not pre-eminent consideration when the highest court of a State assumes to construe and apply the Constitution of that State in the context of legislative apportionment. That clause, verily, is an indispensable component of the Constitution of every State.

January 31, 1964, the constitutional commission on legislative apportionment concluded finally that it could not "agree on a plan." That conclusion, having been duly reported to the Court, has brought said paragraph 7 into immediate play. Too, it has brought prompt submission of proposed plans as procedurally provided therein. Now that such plans and all objections thereto have been duly submitted,

---

[1] "If a majority of the commission cannot agree on a plan, each member of the commission, individually or jointly with other members, may submit a proposed plan to the Supreme Court. The Supreme Court shall determine which plan complies most accurately with the constitutional requirements and shall direct that it be adopted by the commission and published as provided in this section." (Const 1963, art 4, § 6, paragraph 7.)

I deem it in order that the following statement should issue at once:

Until our currently suspended decision of *Scholle* v. *Secretary of State,* 367 Mich 176, is reversed or affirmed, directly or by some of the several forthcoming decisions of the supreme court,[2] or is released to us by denial of certiorari, this Court remains disabled from determining "which plan complies most accurately with the constitutional requirements."[3]    And the quicker that fact is made known, so much the better for a State which may face—as of end of the current year—an interregnal breakdown along with governmental disorder of most serious proportions.    Compare the conflicting views of former Chief Justice CARR, supported by Justices DETHMERS and KELLY (367 Mich at 199 *et seq.*), with those of Justices SOURIS and SMITH (367 Mich at 243 *et seq.*), the latter supported in such regard by the writer (367 Mich at 250, 251).    Compare also sections 3 and 5 of the schedule and temporary provisions (Const 1963).    Section 5, employing "notwithstanding" language, *mandates election of the senate in 1964 for a 2-year term.*

Some students of current legal events regard the *Scholle* decision as moot.    They say this Court merely decided that the 1952 amendments of Michigan's former Constitution were invalid under the National equality clause and, since those amend-

[2] In this memorandum all references to "the supreme court" are to the supreme court of the United States.

[3] Our temporary disability stems partly from duty to consider and construe the *entire* Constitution of 1963 for the purpose of determining "which plan complies most accurately with the constitutional requirements," partly from settled conviction that our Court must ascertain initially what "equal protection" means in the unitary context of the National equality clause and the corresponding clauses of sections 1 and 2 of article 1 of that Constitution, partly from the supreme court's stay order of July 27, 1962, and partly from the pendency of decision upon a petition for writ of certiorari certain of the defendants have submitted, to the supreme court, to review our *Scholle* decision.

ments are no more, the *Scholle* decision is of no present significance.

The allegation is erroneous, as *all* contending parties—for and against grant of certiorari—made clear by memoranda filed with the supreme court last year. The prevailing opinions of the *Scholle Case,* unless reversed by the supreme court, or overridden in some other case by the supreme court, will stand as Michigan precedent. Such precedent is relevant to our task under said paragraph 7 by force of the supremacy clause (US Const, art 6) and the oath we have taken (Const 1908, art 16, § 2; Const 1963, art 11, § 1). The supremacy clause considered, the Constitution of each of the States has written into it, firmly as if printed before the reader's eyes, a special and controlling proviso which in so many words says that, when that State's Constitution is capable of 2 constructions, one of which would conflict with some provision of the National Constitution, the other must prevail.[4] Thus it is that the equality clause of the National Constitution complements and supplements and, in case of conflict, modifies to the extent of such conflict the Constitution of each of the States. The equality clause, is, indeed, "as much a part of the laws of every State as its own local laws and Constitution" (*Blythe* v. *Hinckley,* 173 US 501, 508 [19 S Ct 497, 43 L ed 783]; 180 US 333, 338 [21 S Ct 390, 45 L ed 557]).[5]

---

[4] "This is exemplified by the doctrine, applied in the construction of the State Constitutions, that where a provision of a State Constitution is capable of 2 constructions, 1 of which would be in conflict with the Federal Constitution, the other must be adopted." 11 Am Jur, Constitutional Law, § 55 p 666.

[5] This is doubly and pertinently true in Michigan, our longstanding equal protection clause having been voluntarily—by this Court—given exact parallelism with the National equality clause.

"The equality of rights protected by our Constitution is the same as that preserved by the Fourteenth Amendment to the Federal Constitution. *In re Fox's Estate,* 154 Mich 5." *Naudzius* v. *Lahr,* 253 Mich 216, 222 (74 ALR 1189, 30 NCCA 179), followed in *Cook Coffee Co.* v. *Village of Flushing,* 267 Mich 131, 134.

Even without our counterpart equality clauses the National equality clause would require controlling consideration in the construction and application of the Constitution of 1963. Consequently, the prevailing opinions in the second *Scholle Case,* unless they are directly reversed or overridden otherwise by the supreme court, will determine the pertinent construction some of us—ultimately in these proceedings—will place upon "this Constitution." But for the pending petition for writ of certiorari and the stay order of July 27, 1962, this Court would be free, indeed obliged, to apply such precedent in determining which plan "complies most accurately with the constitutional requirements."[6]

I attach much interpretive importance to the fact that our decision in the second *Scholle Case* was handed down (July 18, 1962) prior to final approval, by the constitutional convention, of "this Constitution." That decision was before the delegates and, on account of it, they made a significant change of the constitutional "Schedule."[7] And the delegates did

Note that former article 2, § 1 (Const 1908) is now section 1 of article 1 of the Constitution of 1963. In addition, the Constitution of 1963 includes a separate and complementing guaranty of equal protection. That appears in section 2 of said article 1.

[6] If this Court is to apply—in due time—its own rules of constitutional construction, what was said in *Fox, Naudzius,* and *Cook,*, with respect to the unitary extent of Fourteenth Amendment equal protection and Michigan equal protection, was before the people when. they voted sections 1 and 2 of article 1 into the new Constitution. Said sections 1 and 2, by due intendment, were approved "in the light and understanding of prior and existing laws and with reference to them." (See rules of construction, *Bacon* and *Lockwood,* cited post.)   And one of those "laws" was our decision in the second *Scholle Case.*

[7] *Prior* to handing down of the *Scholle* decision, section 6 of the "Schedule" which section theretofore (May 11, 1962; Constitutional Convention Record pp 3236, 3275) was a part of "the revised Constitution as passed," read as follows:

"Sec. 6. The State shall be districted for the purpose of electing senators in accordance with the provisions of section 2 of article 4 of this Constitution, after the official publication of the total population count of the 1970 decennial Federal census. Until the apportionment of the senate following the 1970 census, the senatorial districts under the 1908 Constitution shall remain intact except that upon the adoption of this Constitution each of the counties of Kent,.

*not* at any time eliminate from any proposed draft, or qualify in any · way, the successive guaranties of equal protection the reader finds in said sections 1 and 2 of article 1.

Similar interpretive importance is laid upon the fact that the equality clauses of sections 1 and 2 of article 1, and the districting and apportionment provisions of sections 2 and 3 of article 4, were *simultaneously* approved by the people *as parts of*

Genesee, Macomb and Oakland shall be divided by the apportionment commission into 2 senatorial districts and Wayne county into 8 senatorial districts in accordance with this Constitution. The legislature may give prior effect to section 2 of article 4 of this Constitution, which action shall not be subject to veto by the governor."

*After* handing down of the *Scholle* decision, and no more than 6 hours before the constitutional convention passed into history, section 6 was hastily stricken from the "revised constitution as passed." Said section 6 was *not* replaced by any likeness or counterpart. In consequence, the task of construction and application, when ultimately that is undertaken pursuant to aforesaid paragraph 7, will not in any view require consideration of a provision which directs that the commission district and apportion according to a section or article distinguished from the instrument as a whole.

Republican delegate Leibrand, of Bay City, voted against the floor amendment by which section 6 was eliminated. He said, shortly before noon on that last life-day of the convention, with no delegate rising to dispute him:

"I voted against the amendment for several reasons:

"1. The change is a very important one. Many of the delegates never heard of the proposed amendment until about 9:00 p.m. on the evening of July 31st. Most of the delegates never heard of it until it was offered on the floor of the convention at 11:00 a.m. on August 1st. I believe such an important change deserves much more extended consideration.

"2. Many things, particularly decisions of the United States supreme court and the Michigan Supreme Court, have occurred since this convention adjourned on May 11th. The body most affected by the change is the Michigan State senate itself. The senate has been studying and working on this problem for the past 2 weeks or more, and undoubtedly has more information on the problem than do the delegates of this convention. I am opposed to deleting section 6 until such time as a special committee of this convention has conferred at length with the proper committee or committees of the State senate regarding the course to take.

"3. I realize that what I suggest will require further adjournment of this convention. I have no desire to return to Lansing again, but I would prefer to do this rather than make an irremediable error. It must be remembered that once the convention adjourns sine die, its powers are exhausted and, however bad an error may be, that error cannot be corrected." (*Constitutional Convention Record,* ·p 3299.)

*1 instrument.* The situation in such regard is quite
unlike that which faced the Court in the 2 *Scholle
Cases.*    There it was necessary to prefer—to the
extent of conflict—the 1952 amendments over Michigan's 1908 guaranty of equal protection; the latter
having been provided by section 1 of article 2 of
the former Constitution.    As noted by the writer in
the first *Scholle Case* (360 Mich 1, at 111), following
the *Thoman Case* (*Thoman* v. *City of Lansing,* 315
Mich 566, 579), "the earlier provision must yield to
the later."  Here there is no "earlier" and no "later"
provision.  All are united; hence we cannot say "that
any clause in the Constitution was intended to be
without effect."   (See present full quotation, *Marbury* v. *Madison.*)   To give sections 2 and 3 of article
4 the exclusive effect demanded for the Hanna Plan,
it would be necessary to ignore contemporaneous
sections 1 and 2 of article 1.  And to give sections
1 and 2 of article 1 the exclusive effect demanded for
the Austin-Kleiner Plan would eliminate due regard
for contemporaneous sections 2 and 3 of article 4.

Since by all authority extant the 4 sections are
to be construed as coalescent, it need only be said
that some or all may, ultimately, have to give somewhat in order that none shall suffer material subordination.   Marshall pursued this thought fully in
*Marbury* v. *Madison,* 1 Cranch (5 US) 137 (2 L ed
135).  The beginning and concluding sentences of the
point made at the time are quoted as follows (5 US
at 174, 175):

"It cannot be presumed that any clause in the Constitution is intended to be without effect; and therefore such a construction is inadmissible, unless the
words require it. * * *

"If any other construction would render the clause
inoperative, that is an additional reason for rejecting
such other construction, and for adhering to their
obvious meaning."

Without intending to hint that the intent of the delegates, whatever such intent may have been that last day in the circumstances related by delegate Leibrand, controls or could control over the laws and usages of the times,[8] I regard it as additionally meaningful that the mandate to district and apportion "according to the provisions of *this Constitution*," and to "determine which plan complies most accurately with *the constitutional requirements*," was *not* changed by the delegates after handing down of the *Scholle* decision on July 18, 1962. All this leaves, reasonably, but 1 interpretive conclusion; that the apportionment commission's task, and our task in turn, should be done in accordance with the principles of constitutional construction to which reference has been made and will now be made in greater detail.

The guiding canon of constitutional construction is that no one provision is to be separated from the others, to be considered alone, but that all provisions bearing upon a particular subject are to be brought into view and interpreted so as to effectuate the great purposes of the instrument. Hence, fortified *by the significant omission*—from section 6 of said article 4 —of words fitting the most compliant "plan" to the "provisions" or "requirements" of article 4 only, and *by the actual employment* of words fitting the most compliant "plan" to the "provisions" or "requirements" of "this Constitution," I look upon simultaneously adopted sections 1 and 2 of article 1 and sections 2 and 3 of article 4 as due for construction according to the rule *in pari materia*. For controlling reasons, see *Patton* v. *United States,* 281 US 276, 298 (50 S Ct 253, 74 L ed 854, 70 ALR 263). Construed thus, "equal protection" qualifies sections

---

[8] For quotation and citation of applicable authority see *Bacon* v. *Kent-Ottawa Metropolitan Water Authority,* 354 Mich 159, and *Lockwood* v. *Commissioner of Revenue,* 357 Mich 517, 565–570.

2 and 3 of article 4 to the extent necessary for harmonious application of articles 1 and 4; also to the extent necessary for assurance of Fourteenth Amendment equality. The nature and extent of such qualification thus becomes our problem.

The controlling principle of constitutional construction came to full enunciation in *Ullmann* v. *United States,* 350 US 422, 428, 429 (76 S Ct 497, 100 L ed 511, 53 ALR2d 1008):

"As no constitutional guarantee enjoys preference, so none should suffer subordination or deletion. It is appropriate to read the conviction expressed in a memorable address by Senator Albert J. Beveridge to the American Bar Association in 1920, a time when there was also manifested impatience with some of the restrictions of the Constitution in the presumed interest of security. His appeal was to the Constitution—to the whole Constitution, not to a mutilating selection of those parts only which for the moment find favor. To view a particular provision of the Bill of Rights with disfavor inevitably results in a constricted application of it. This is to disrespect the Constitution."[9]

Assuming all this is acceptable, we come to an ultimately decisive question: What is equal protection in the context of apportionment of our State Legislature? If it is what 4 present members of the Court—albeit in different degree—stood for in 1962 (second *Scholle Case*), then the Austin-Kleiner plan probably comes closest to compliance "with the

[9] By footnote (p 428) Justice Frankfurter quoted Senator Beveridge:

"If liberty is worth keeping and free representative government worth saving, we must stand for *all* American fundamentals—not some, but all. All are woven into the great fabric of our national well-being. We cannot hold fast to some only, and abandon others that, for the moment, we find inconvenient. If 1 American fundamental is prostrated, others in the end will surely fall. The success or failure of the American theory of society and government, depends upon our fidelity to every 1 of those interdependent parts of that immortal charter of orderly freedom, the Constitution of the United States."

constitutional requirements." If it is what the remaining members of the Court stood for on that same occasion, then 1 of the other competing plans most accurately complies. And if it is a "blend" of such conflicting views, then we must savor that blend prior to determination of paragraph 7's posed question. The final answer will have to come, the supremacy clause considered, from Washington. That answer, now, is reasonably expectable on or before the date fixed by our order of even date, which order suspends until April 15th the determination called for by said paragraph 7.

It would, without doubt, evidence presumptuous conduct on our part should we assume to guess now what standards the supreme court will provide for ascertainment of equal protection in the processes of State legislative apportionment. By force particularly of *Fox, Naudzius,* and *Cook* those standards, when promulgated, will determine the relevant construction and application of "this Constitution." They will indeed fix the nature and extent of the equal protection sections 1 and 2 of said article 1, and with the National equality clause, provide together for today's problem and its solution.

### Summary of Notes Made Upon and Since Oral Argument

*First:* The casehardened fact, controlling of these proceedings at present, is that neither the commission nor this Court may, upon strength of dependable legal authority, proceed effectively toward any of the determinations paragraphs 5, 7, and 8 (of section 6 of article 4) do require. That our Court may be enabled to proceed, with its paragraph 7 function on some early supreme court release-date, is simply to say that we then may, with due promptness, determine which plan "complies most accurately with the constitutional requirements."

One need but suggest that, should the Court determine now that the Austin-Kleiner plan "complies most accurately," the supreme court might—after our *"fait"* has become enmeshed with much *"accompli"*—reverse our decision in the second *Scholle Case*. Or, on the other hand, let us assume that, having selected this week the Hanna plan as most accurately compliant, we learn after too many steps have been taken in reliance upon such selection that the supreme court has affirmed that same decision. Where, in either event, would that leave Michigan's legislative process, the January to November schedule of the Constitution considered? It is better at this stage, I conclude, to await what are probably near in the way of guiding developments than to commit ourselves to a possible if not probable compound of confusion made already by the weird timetable article 4 and the Schedule have dictated. Upon what consideration may one ascertain just how the delegates came to conclusion that such a timetable could be met between January 1, 1964 and November 3, 1964? Like Pollyanna, the delegates must have believed that not 1 elector would accept the invitation to litigation paragraph 8 (of section 6 of article 4) extends to all who might be dissatisfied with our paragraph 7 selection.

*Second:* The National equality clause, and our own equality clauses, are tied together by our own act as well as by the supremacy clause. Ours extend exactly as far as—and no farther than—the National equality clause. The supreme construction of the National equality clause, in the area of legislative districting and apportionment, must be known in order that that of the others may be applied, and in order that this Court may go ahead with proceedings called for by said paragraphs 7 and 8.

*Third:* What this Court determines and finally decides, in pursuance of the procedures called up by

said paragraphs 7 and 8, will amount to no provisional or fleeting act of a temporarily seated Court. Our *final* determination, to be made as directed by said paragraph 8, will include an abiding rule of construction the commission will apply when the census figures of 1970 are available, and then when each decennary thereafter calls for application of that rule to the then most recent census figures.

That rule of construction had better be right. It cannot now be made dependably right, even as a matter of construction exclusively of the provisions that are actually written into the Constitution of 1963, unless the Court is ready to sever the worthy nexus (made by *Fox, Naudzius* and *Cook*) which exists between section 1 of article 1 of that Constitution and the National equality clause. And since the Court is not of such severing will, it follows that, even if section 2 of said article 1 is (as alleged by the supporters of the Hanna plan) ineffective for want of legislative implementation, section 1 of said article 1 (alone and by itself) commands due interpretive adherence to the principles of equality called for by the Fourteenth Amendment.

*Fourth:* Upon oral argument it was suggested that, if the Court is not "satisfied" with any 1 of the submitted plans, it may if of such will remand to the commission with direction to prepare and submit new plans in accord with unitary sections 1 and 2 of said article 1 and sections 2 and 3 of said article 4.

I am opposed to any such action for 2 reasons:

The first is that the seventh paragraph of said section 6, under which paragraph the Court solely may act at present, negatives in plain terms any such action of remand. Our duty under said paragraph 7 is exclusive and restricted. Refer to it as quoted on the first page of this memorandum. True, when these proceedings ultimately get around to "the exercise of original jurisdiction" (under paragraph 8 of

said section 6), we may "remand" for any duly resolved purpose.   But we are by no means at that stage of constitutional procedure today.

The second reason for aforesaid opposition is that any such order of remand, even if our majority did agree upon it, would be an exercise in total futility. It is perfectly manifest, as the arguments on all sides have demonstrated with clarity, that this half Democratic and half Republican commission could never agree upon what constitutes "equal protection" until the Supreme Court speaks finally in the context of districting and apportionment of a State legislature. We should, in sum, wait for a time at least for definitive directions from our superior court before proceeding further under said paragraphs 7 and 8.

*Fifth:* Justice DETHMERS, supporting rhetorically the forensic oral dixits of Commissioner Brucker, avers upon strength of something *not* of record and *not* judicially noticeable that "the constitutional convention delegates, and the people in adopting the Constitution, never intended that districting and apportioning should be other than as in article 4 provided."   Then, in rising crescendo, my Brother alleges that "It is ludicrous to even imagine that it was the intent of the constitutional framers and adopters to create a legislative apportionment commission empowered to district and apportion, in utter disregard of the requirements of article 4 and in any manner which they might think, with this Court's agreement, would comply with the commission's or this Court's concept of equal protection of the laws."

Of course, no one has even suggested that the requirements of article 4 should be disregarded, utterly or otherwise.   Such expansive rhapsodies are typical of keynoters at political conventions but hardly proper for this, a serious proceeding of momentous

portent. Neither Justice DETHMERS nor Commissioner Brucker have been sworn as witnesses respecting *their* knowledge of what the people understood and believed when they voted for and against the new Constitution. If it were possible to have either one sworn respecting the extent and basis of *his* knowledge in such regard, the prospect of searching cross-examination would be inviting altogether. The fact is, and I refer here to Justice COOLEY's great "if" (*People, ex rel. Bay City,* v. *State Treasurer,* 23 Mich 499, at 506)[10], there is no dependable way now, save by resort to the instrument itself, to ascertain whether Justice DETHMERS and Commissioner Brucker are right or wrong about their asserted knowledge. Accordingly, and noting again what Delegate Leibrand said that last day, it is best as I conceive that we look to the instrument for sure and pertinent guidance, rather than to bombastic asseverations of unsupported fact.

Commissioner Brucker and my Brother DETHMERS have taken the same oath the rest of us have taken, that is, the oath required by article 6 of the Constitution of the United States. Thus rises to the fore my conviction that the mandate of section 6 of article 4 (that we determine which plan complies most accurately with the constitutional requirements) calls for primary respect and attention to the National instrument, and our own Constitution, rather than to article 4 only.

PER CURIAM.

In November of 1963 six legislative apportionment appeals were argued before the United States supreme court.* Since the supreme court alone can

---

10 "They [the courts] must construe them [constitutions] as the people did in their adoption, if the means of arriving at that construction are within their power."

* No 20, *W.M.C.A., Inc.,* v. *Simon, Secretary of State* (on appeal from DC SD NY, 196 F Supp 758 [374 US 802, 83 S Ct 1691, 10 L ed 2d 1028]); No 29, *Maryland Committee for Fair Representation*

decide with ultimate authority binding upon this Court the nature and extent of the requirements of the Fourteenth Amendment's equality clause in the context of legislative apportionment, an issue of controlling importance herein, and since in our judgment its decisions in those pending appeals are imminent, we join in deferring further action herein until April 15, 1964.

KAVANAGH, C. J., and BLACK, SOURIS, SMITH, and ADAMS, JJ., concurred.

v. *Tawes, Governor* (on appeal from Maryland court of appeals, 229 Md 406 [184 A2d 715] [374 US 804, 83 S Ct 1691, 10 L ed 2d 1029]); Nos 23, 27, 41, *Reynolds, Judge of Probate,* v. *Sims, Vann* v. *Frink, Secretary of State,* and *McConnell* v. *Frink, Secretary of State* (on appeal from DC MD Ala, 208 F Supp 431 [374 US 802, 83 S Ct 1692, 10 L ed 2d 1029]); and No 69, *Mann* v. *Davis* (on appeal from DC ED Va, 213 F Supp 577 [374 US 803, 83 S Ct 1692, 10 L ed 2d 1029]). See 32 Law Week 3189.

See 372 Mich 418. Submitted March 3, 1964. (Calendar No. 95, Docket No. 50,705.) Opinions filed April 10, 1964. Decision deferred.

SOURIS, J.

1. Whatever the duties we perform as Justices of the Supreme Court, whether authorized by our general grant of judicial authority contained in the sixth article of our Constitution of 1963 or required by the special provisions of article 4, § 6, paragraph 7, obedience to and support of the Constitution of the United States must be our constant concern. Article 6 of the United States Constitution commands our obedience and support:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under

the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

"The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States."

Each of us, by implementing local command, has sworn support. Article 11, § 1, Constitution of 1963[1] provides:

"All officers, legislative, executive and judicial, before entering upon the duties of their respective offices, shall take and subscribe the following oath or affirmation: I do solemnly swear (or affirm) that I will support the Constitution of the United States and the Constitution of this State, and that I will faithfully discharge the duties of the office of . . . . . . . . . . . . . according to the best of my ability. No other oath, affirmation, or any religious test shall be required as a qualification for any office or public trust."

I do not suppose that any rational being would suggest that we would be obliged to make the determination of accurate compliance called for from us by paragraph 7 of article 4, § 6 if the several apportionment plans submitted to us were based upon a racial classification of voters expressly permitted by article 4 in obvious violation of the Fifteenth Amendment to the United States Constitution or that we would be impotent to refuse to participate

---

[1] Its counterpart provisions are found in our 1908 Constitution at article 16, § 2; in our 1850 Constitution at article 18, § 1; and in our 1835 Constitution at article 12, § 1.

as public officers in any such action which in our judgment violated the Fifteenth Amendment. Yet, the suggestion has been made that "it is not open to us in this matter to determine Federal constitutional questions," by which it is meant that article 4, § 6, paragraph 7 requires we determine, at least for the present, which of the 4 apportionment plans submitted complies most accurately with the specific requirements found in article 4 without any regard for the overriding supremacy of the United States Constitution, including the equality clause of its Fourteenth Amendment. The suggestion is manifestly erroneous, the quoted portion of article 6 of the United States Constitution and our oaths considered. We not only may consider the equality clause's effect upon the provisions of article 4 now and whatever the nature of our present services, but we must. Before this Court may stamp its imprimatur upon any apportionment and districting plan submitted to it under article 4, it must measure such plans and article 4 itself against the standards of the national equality clause for determination of compliance therewith. Failure of such compliance will invalidate any plan so submitted regardless of its compliance with all local requirements. Article 6, United States Constitution, and *Blythe* v. *Hinckley* (1899), 173 US 501, 508 (19 S Ct 497, 43 L ed 783).

2. While this Court 2 years ago, in *Scholle* v. *Secretary of State,* 367 Mich 176, on remand by the United States supreme court (1962), 369 US 429 (82 S Ct 910, 8 L ed 2d 1), for reconsideration in the light of *Baker* v. *Carr* (1962), 369 US 186 (82 S Ct 691, 7 L ed 2d 663), by majority decretal accord declared this State's then current senatorial districts in violation of the Fourteenth Amendment's equality clause, there was substantial difference of opinion among the Court's decretal majority regarding the nature and extent of that equality

clause's requirements in the context of legislative representation. No definitive Federal supreme court construction of that clause in that context then existed. Nor have subsequent decisions from the supreme authority in such regard provided us with more authoritative standards than 4 of us undertook to pronounce in July of 1962 in the *Scholle Case*.

Under such circumstances, and in view of the pendency of the Federal supreme court's decisions in the cases noted *infra,* p 460, a majority of our members determined last month to delay decision herein to minimize the risk of compounding the confusion which already exists in this transition period from one State Constitution to another. In the view I take of this matter, further delay is not warranted notwithstanding our continuing inability to articulate in precise detail and with positive authority all of the standards of the equality clause as it applies to matters of legislative representation. It is clear to me that none of the plans submitted to this Court meets either of the standards our majority applied in *Scholle* and, hence, that the executive and legislative officers of the State might better be so advised now so that they can take whatever corrective actions may be necessary.

3. None of the 4 plans submitted by the apportionment commissioners conforms to the mathematical limitations found by Justices KAVANAGH and BLACK, in *Scholle,* to be implicit in the Federal equality clause. Their "maximal standard" of a population disparity between legislative districts of no greater than 2 to 1 is violated, grossly, by 3 of the 4 plans for both houses of the legislature. The fourth plan, the Austin-Kleiner plan, proposes an apportionment of house seats which, likewise, would violate the 2 to 1 maximal standard[2] although 2 alternative senate

---

[2] Actually, based upon 1960 census data, the Austin-Kleiner House of Representatives proposals would result in disparities of 1.9859 to

apportionment plans are proposed in both of which the population disparities are below 2 for 1, but that which results in the least population disparity still reflects a disparity of as much as 3 to 2.

In *Scholle* I attempted only to suggest some of the factors judicially cognizable in determining compliance in such matters with constitutionally guaranteed equality and expressly limited my effort to recognition of the outer boundaries of the problem confronting us (367 Mich at 247). I was quite certain then, as I am now, although it was not necessary to decision in *Scholle,* that the Federal equality clause requires in this context substantial equality between citizens, not absolute mathematical equality. impossible to maintain even in theory beyond a single point in time, but rather equality which leaves no room for the deliberate weighting of 1 man's vote. and dilution of another's. It means that 1 man's vote equals that of another, whatever their occupation, or their race, or their religion, or their social standing, wherever in the State they may live. It means that no consideration whatever of favor or of penalty can be permitted to shift the nice balance between 1 man's vote and every other. Such extraordinary regard for the equality of franchise is required because exercise of the franchise "is regarded as a fundamental political right, because preservative of all rights. " *Yick Wo* v. *Hopkins* (1886), 118 US 356, 370 (6 S Ct 1064, 30 L ed 220).

Barring deliberate weighting or diluting of votes does not, however, insure mathematically precise equality, nor is such precision a constitutional mandate. While not subscribing to any mathematical rule of thumb, I continue to believe that the equality clause of the Fourteenth Amendment requires that

1.  We need not quibble over whether we should round off such disparities to 2 to 1. *De minimis non curat lex. , Taverner* v. *Dominum Cromwell,* 1 Cro Eliz 353 (78 Eng Rep 601).

there be no more than the *minor* practical inequalities which *unavoidably* may result from a rational, not arbitrary, classification of the State's people into electoral districts. Such minor and unavoidable inequalities can be of infinitesimal magnitude if, for instance, the number of legislators is large enough to permit no greater than proportionate representation of the electoral district with the smallest population; or if county and municipal lines were disregarded;[3] or if multiple representatives for a single district were permitted. Other means by which inequality of representation may be avoided or at least minimized can be devised by anyone whose real objective is equality.

The inequalities which inevitably will occur, so long as they are both minor and practically unavoidable, will not invalidate an apportionment plan devised in good faith to achieve equality of representation. Our former colleague on this Bench, now United States District Judge TALBOT SMITH, recently had occasion to consider the nature and extent of representative equality required in the allocation of congressional seats within the State, in *Calkins* v. *Hare,* 228 F Supp 824, decided March 26, 1964 in the United States district court for the eastern district of Michigan. His observations are equally apt to the problem we face (p 829):

"It is true that the *Wesberry* court [*Wesberry* v. *Sanders* (February 17, 1964), 376 US 1 (84 S Ct 526, 11 L ed 2d 481)] speaks of 1 vote being 'as

---

[3] I realize that constitutional and statutory requirements that legislative districts follow such established governmental unit boundaries prevent or at least limit gerrymandering and other similarly insidious practices; but it seems to me that the cure for such evils has been worse than the original evil to the extent that such requirements have contributed to the inequalities of franchise rights. Gerrymandering and like evils can be attacked judicially in other ways. *Gomillion* v. *Lightfoot* (1960), 364 US 339 (81 S Ct 125, 5 L ed 2d 120); *Wright* v. *Rockefeller* (February 17, 1964), 376 US 52 (84 S Ct 603, 11 L ed 2d 512).

nearly as practicable' worth that of another, but we do not see in these words an escape hatch for the reluctant. Nor in the caveat that the weight of votes need not be mathematically precise. What is meant here is merely that the ideal district lines enclosing mathematically equal areas of population may make minor departures here and there from such ideal, in accordance with the needs of the situation, and without 'unnecessarily' (*Wesberry,* page 17) abridging the people's rights. But these are minor concessions to practicability, the avoidance of ideal mathematical precision, merely. They are the application in this field of the well-known *de minimis* doctrine. Should the concessions made result in substantial (not minimal) and unnecessary inequalities between the districts, the lines of unconstitutionality will have been crossed. This concept of equality, which some profess to find so puzzling, is not an alien doctrine, newly imported to our shores. Long before *Wesberry,* we knew of the doctrines of equal rights and opportunities, of equal treatment in our courts, and of equal schooling for our children. We need not exhaust the litany. If there is 1 dominant social and political belief held by all our people, it is that we are both free *and* equal. Its implementation with respect to voting rights should present no insurmountable obstacles to those minded to pursue it."

I would regard any plan constitutionally impermissible which does not at least begin with the objective of apportioning legislative representation as nearly as possible in accordance with population. At the very least this objective must be present. Any other objective, such as to insure minimal legislative representation to residents of sparsely populated areas beyond that to which they are entitled by their numbers, flies in the teeth of the equality clause's requirements. Thus it is that none of the plans submitted by the apportionment commissioners, who professed to follow in varying degrees

the provisions of article 4 of the Constitution of 1963, could possibly meet the equality requirements of the Fourteenth Amendment. The 80–20 formula devised for the senate (article 4, § 2) expressly dilutes the importance of population in densely populated areas and enhances it in those areas sparsely populated. Less charitably, but no less accurately, the formula has been said to require the allocation of 2 senate seats to the Upper Peninsula of the State even though its only residents were the 2 senators to be elected therefrom. Such an absurdity results because the area's land and water apportionment factors alone (29.01), without reference to population at all, would be sufficient to entitle it to 2 senators (article 4, § 2[2]).

The formula devised for the house (article 4, § 3) likewise debases population as a determinative factor in apportionment of legislative power, this time in favor of the county unit of government rather than directly in favor of acreage. Section 3 allocates a house seat to each county with at least .7% of the State's population (7,824,018) whereas if the 110 seats provided for were allocated in direct proportion to population a county would have to have .91% of the State's population to entitle it to one seat.

Other requirements of land contiguity, adherence to county and municipal lines, and prohibition against multiple house and senate districts make it impossible to achieve even a semblance of equality for either house within the minor and unavoidable limits constitutionally permissible. The blunt truth is that inequality is built into the legislative apportionment provisions of the Constitution of 1963 in flagrant disregard of the principles of equality required by the Fourteenth Amendment.

I agree with United States District Judge Stephen J. Roth's holding (in dissent) in *Marshall* v. *Hare*,

227 F Supp 989, decided March 16, 1964 in the United States district court for the eastern district of Michigan, that the first 6 sections of article 4 of the Constitution of 1963, except section 1,[4] the first paragraph of section 2,[5] and that portion of section 3 which reads as follows:

"The house of representatives shall consist of 110 members elected for two-year terms from single member districts apportioned on a basis of population"

are void, for violation of the Fourteenth Amendment of the United States Constitution.

Were such to be the holding of this Court, the legislature could by law implement the provisions of article 4 not declared void and, with due regard for the Federal constitutional requirements of equality, discussed above, legislative apportionment could be accomplished yet this year. Regrettably, it must await compulsion by Federal decree from our only judicial superior.

O'HARA, J. On March 5th I joined 5 of my colleagues in deferring decision herein to a date no later than April 15th. My stated purpose was to await until the last practicable moment for a decision of the United States supreme court in cases which then impended, and still impend, involving the permissibility of considering nonpopulation factors in apportionment of State legislative districts, senatorial and representative. Such decision has not been handed down. For myself, at least, I can await Federal guidelines no longer. We have a duty to our coordinate branch of government in

[4] Article 4, § 1:
"The legislative power of the State of Michigan is vested in a senate and a house of representatives."
[5] Article 4, § 2:
"The senate shall consist of 38 members to be elected from single member districts at the same election as the governor for four-year terms concurrent with the term of office of the governor."

the discharge of their obligation to provide legislative and senatorial districts from which representatives and senators can be chosen. This duty is no less sacred than any other aspect of our oath-bound duties. We cannot abide word from Washington to the peril of elective chaos in our State. What we do now is not immutable and decision presently is infinitely preferable to perilous inaction.

I know of no United States supreme court precedent which explicitly holds that the formula factors of the Michigan Constitution of 1963 as they relate to State legislative districting would offend against the equality clause of the Fourteenth Amendment of the Federal Constitution. I find as much prospective persuasive value in the majority opinion in *Bush* v. *Martin,* (DC SD Tex), 224 F Supp 499, as Mr. Justice Souris does in the dissent of Judge Roth in *Marshall* v. *Hare.*[1] Both were decisions of 3-judge Federal district courts. The judgment in *Bush,* however, was affirmed by the United States supreme court without opinion.[2] Conceding that what the majority said there might be *dicta,* I may not presume that when the United States supreme court affirmed the judgment, it was not aware of the lower court's plain language:

> *"The problem of the distribution of the legislative power, the machinery by which it operates, or the electors who establish it* (see, *e.g.,* notes 21, 22, *supra*), *is essentially one of meeting the imperative demand of a republican form of government under the guaranty clause of the Constitution. US Const art 4, § 4. The present indications are that considerable leeway must be allowed to the States in the diffusion of its political initiative.* See, *e.g., Gray* v. *Sanders* (1963), 372 US 368 (83 S Ct 801, 9 L ed 2d

---

[1] Decided March 16, 1964, in the United States district court for the eastern district of Michigan.

[2] 32 LW 3304.

821, 827, 828), especially the concurring opinion, 372 US at 381, 382 (83 S Ct at 809, 9 L ed 2d at 831); *cf. Scholle* v. *Hare* (1962), 369 US 429, 430–432 (82 S Ct 910, 911, 8 L ed 2d 1, 2–4). *To put it another way, unless the State constitutional or legislative standards impose numerical equality as the predominate test and then under circumstances which elevate such local standards to a federally guaranteed right, a number of other elements may well be open besides population. .These perhaps include geography, area, economic, social, topographical, sociological or political factors."   Bush* v. *Martin, supra.*  (Emphasis supplied.)

I held on March 5th that the Hanna-Huhtala-La-Porte-Brucker plan and the Dongvillo plan complied equi-accurately with the 1963 Michigan State constitutional requirements, except for the contention of contiguity of the 2 peninsulas by land which was included in the Dongvillo plan.  It appears neither plan can command a majority vote of our Court presently.  Two votes having already been cast for the Hanna-Huhtala-LaPorte-Brucker plan, I hereby hold it complies most accurately with the constitutional requirements and I join in directing that it be adopted by the commission and published as provided by the 1963 Michigan Constitution.

ADAMS, J.  Justice SOURIS has admirably stated the overriding importance of the supremacy clause of the United States Constitution.  I am in hearty agreement.  I differ with him in his decision that further delay is not warranted at this time.  If anything, the reasons for further delay are more compelling now than when a majority of the members of this Court determined in March of this year to withhold decision until April 15th.

There are presently before the United States supreme court cases involving the apportionment of 6 State legislatures.  The decision in any 1 of them

is certain to provide applicable principles for this Court. See: *W.M.C.A., Inc.,* v. *Simon, Secretary of State* (DC SD NY), 208 F Supp 368, argued November 12, 13, 1963; *Sims* v. *Frink, Secretary of State* (DC MD Ala), 208 F Supp 431, *sub nom Reynolds, Judge of Probate,* v. *Sims,* #23, *Vann* v. *Frink, Secretary of State,* #27, *McConnell* v. *Frink, Secretary of State,* #41, argued November 13, 1963; *Maryland Committee for Fair Representation* v. *Tawes, Governor,* 229 Md 406 (184 A2d 715), argued November 13, 14, 1963, #29; *Mann* v. *Davis* (DC ED Va), 213 F Supp 577, argued November 14, 18, 1963, #69; *Sincock* v. *Duffy* (DC Del), 215 F Supp 169, *sub nom Roman* v. *Sincock* on appeal, argued December 9, 1963, #307; *Lisco* v. *Love* (DC Colo), 219 F Supp 922, *sub nom Lucas* v. *Forty-Fourth General Assembly of Colorado,* #508, argued March 31 and April 1, 1964.

As Justice SOURIS has pointed out, in the final sentence of his opinion, the United States supreme court is our judicial superior. Since October 12, 1962, that court has withheld its approval or disapproval of this Court's decision in *Scholle* v. *Secretary of State,* 367 Mich 176. Yet Justice SOURIS would apply the standards set forth in that case. Those standards are under suspension. To move to a decision based upon them can only result in confusion worse confounded.

It is our bounden duty to decide the present matter upon the basis of the controlling decisions of the United States supreme court. For past months, courts throughout the United States have been engaged in the exercise of attempting to read the collective mind of the United States supreme court and ascertain the probable holding of a majority of that closely divided body. For examples of excellent endeavors to do so, see: *W.M.C.A., Inc.,* v. *Simon, Secretary of State* (DC SD NY), 208 F Supp 368, 372,

373, and *Davis* v. *Synhorst, Secretary of State* (DC SD Iowa), 217 F Supp 492, 496–498. It is of some significance that in all of such efforts as well as in the vast majority of apportionment cases the courts have come to a contrary decision from the one arrived at by Justice Souris. See *Mann* v. *Davis* (DC ED Va), 213 F Supp 577, 585; *Baker* v. *Carr* (DC MD Tenn), 206 F Supp 341 (after remand by United States supreme court); *Lisco* v. *McNichols* (DC Colo), 208 F Supp 471; *Sobel* v. *Adams* (DC SD Fla), 208 F Supp 316, 321 (1st Case), 214 F Supp 811, 812 (2d Case); *Toombs* v. *Fortson* (DC ND Ga), 205 F Supp 248, 257; *Davis* v. *Synhorst* (DC SD Iowa), 217 F Supp 492; *Levitt* v. *Maynard,* 104 NH 243 (182 A2d 897); *Jackman* v. *Bodine,* 78 NJ Super 414 (188 A2d 642, 650–652); *Nolan* v. *Rhodes* (DC SD Ohio), 218 F Supp 953; *Griffin* v. *Board of Supervisors,* 60 Cal 2d 751 (36 Cal Rptr 616, 388 P2d 888) 32 LW 2408; *Germano* v. *Kerner* (DC ND Ill), 220 F Supp 230; *Marshall* v. *Hare* (DC ED Mich), 227 F Supp 989.

To date the only decisions found that could be construed to uphold the one advocated by Justice Souris are: *Sweeny* v. *Notte,* — RI — (183 A2d 296); *Sincock* v. *Duffy* (DC Del), 215 F Supp 169, *sub nom Roman* v. *Sincock* on appeal, and *Butterworth* v. *Dempsey* (DC Conn), 229 F Supp 754, 32 LW 2407.

Nevertheless there is great cogency and force in the interpretation of the Fourteenth Amendment which Justice Souris would make. It may well reflect the decision the United States supreme court will hand down any day now. When that day comes I will be pleased to join with him. Until it does, I do not conceive it to be the proper duty or function of this Court to attempt to outrun the supreme court of the United States. As was found by a majority of this Court in the first *Scholle Case* (*Scholle* v.

*Secretary of State,* 360 Mich 1), we have no right to extend our interpretation of the United States Constitution beyond the boundaries that have been delineated by the United States supreme court.

I, therefore, hold that this Court should abstain from decision in this matter at this time because of my confident assurance that within a matter of days or, at the most, a very few weeks, it will be possible, under the guidance of the United States supreme court, to issue an authoritative decision which will not be subject to uncertainty or attack and which will permit Michigan to proceed with a minimum of confusion and delay to the November election.

Supplemental Memorandum of Justice Black: When, warned as it was by then attorney general and now Justice Adams ('OAG Nov. 20, 1961 [on file in attorney general's office]),[1] the constitutional convention failed to adjust the timing of article 4 of the ultimately adopted Constitution to the probability, and the actual fact as it turned out, that the convention's product would be submitted to the people at the spring election of 1963 rather than the fall election of 1962, the result in legal parlance became that of practical "impossibility of performance"—in 1964— of section 6 of that article. Such is a fact this Court must face, forthrightly sooner or later, unless it enjoys the manna-time of no original proceedings whatever under the last paragraph of said section 6.

For the needs and purposes of 1964 legislative elections article 4 has allowed no more than 5

---

[1] Attorney General Adams ruled, for the convention, that the proposed constitution could *not* be submitted to the people, *prior* to the spring election of 1963, unless the convention adjourned finally on a date much earlier than the ultimate date of its final adjournment. Such ultimate date was August 1, 1962 (constitutional convention official record, volume 2, page 3316). The proposed constitution accordingly was submitted to and adopted by the people at the spring election of 1963, thus compressing by a year the time for due performance of all proceedings called for by section 6 of article 4 thereof.

months, at realistic best, for requisite proceedings resulting in the *legally final* districting and apportionment of both houses of the legislature. During that 5-month period section 6 of said article 4 requires (a) that the commission on legislative apportionment conclude its work, either by districting and apportionment of "the senate and house of representatives according to the provisions of this constitution" or, in the alternative, that the commission report to this Court that it "cannot agree on a plan"; (b) in the latter event (and so it has turned out), that a proposed plan or plans be submitted to this Court and that the Court "determine which plan complies most accurately with the constitutional requirements", and (c), after this Court has completed such due and provisional portion of its constitutional task, that it entertain a petition or petitions (provided such are filed "not later than 60 days after final publication of the plan"), addressed to our original jurisdiction, the primary design of such petition or petitions being that of testing finally the constitutional validity of the published "plan."

It seems not to have occurred, to any one of the 144 learned delegates, that the litigation invited by paragraph 8 of said section 6 would necessarily involve undecided Federal questions bruited ever since *Baker* v. *Carr* (March 26, 1962), 369 US 186 (82 S Ct 691, 7 L ed 2d 663) was officially reported. Too, it does not seem to have occurred to any one of the lawyer delegates that litigation of such nature—if instituted—never could have been started and concluded in time for the legislative elections of 1964. Thus does this Court find itself in position, outlined in the writer's previous memorandum (372 Mich 448, 456, 457) and to the even more timely point in Justice Adams' current opinion, where hasty and divisive action taken now, either under said paragraph 7 or under color of our general jurisdic-

tion, would result surely in Macduff's return for exclamation that "Confusion now hath made his masterpiece!".[2]  And I do not care at this point, even though tentatively convinced of the final outcome (see discussion *post* of the *Lucas Case*), to join in any "prediction" or "prophecy"[3] of the controlling nature of any forthcoming decision of our superior, the United States supreme court.

Justice DETHMERS, writing March 5, 1964 (372 Mich 418), for determination that the Hanna "plan" complies most accurately with the constitutional requirements, relies heavily (p 441) on the closely divisive 3-judge decision of *Lisco* v. *Love* (DC Colo), 219 F Supp 922.  Our Brother did not note that *Lisco* had been appealed to the United States supreme court and, on December 9, 1963, that the supreme court had noted probable jurisdiction, 375 US 938 (84 S Ct 351, 11 L ed 2d 270).

The *Lisco Case,* obviously intended for commanding importance, is now entitled *Lucas and Lisco* v. *Forty-Fourth General Assembly of Colorado,* No. 508.  The appeal was, on January 6, 1964, 375 US

---

[2] Shakespeare, Macbeth, act 2, sc 3.—REPORTER.

[3] "We shall unite in viewing as law that body of principle and dogma which with a reasonable measure of probability may be predicted as the basis for judgment in pending or in future controversies. When the prediction reaches a high degree of certainty or assurance, we speak of the law as settled, though, no matter how great the apparent settlement, the possibility of error in the prediction is always present.  When the prediction does not reach so high a standard, we speak of the law as doubtful or uncertain.  Farther down is the vanishing point where law does not exist, and must be brought into being, if at all, by an act of free creation.

"I wrote these words before I had seen an interesting article by Dr. John C. H. Wu on the 'Juristic Philosophy of Mr. Justice Holmes.' My thought, it will be seen, is in close approach to theirs.  'The prophecies of what the courts will do in fact, and nothing more pretentious,' says Holmes, 'are what I mean by the law.'  Dr. Wu develops with acuteness the implications of the statement.  'Law is, thus, a matter of prediction.  It does not even consist of the rules already recognized and acted on, as Salmond would define it; it consists of the rules which the courts will probably recognize or act on.'"  (Cardozo, The Growth of the Law, pp 44, 45).

The article quoted by Justice Cardozo, entitled "Juristic Philosophy of Mr. Justice Holmes," appears in 21 Michigan Law Review 523.

961 (84 S Ct 481, 32 LW 3243), "set for argument on Tuesday, March 31, 1964."[4]  Then on March 9, 1964, a motion of the solicitor general of the United States, for leave to participate in the oral argument as *amicus curiae,* was granted 376 US 941 (84 S Ct 796, 32 LW 3314).  The appeal accordingly came to oral argument March 31st and April 1st (32 LW 3349).  The writer personally attended the principal portion of such argument and returned to Michigan convinced that the decision of *Lucas* will determine, probably and finally, "which plan [if any] complies most accurately with the constitutional requirements"; also that the decision doubtless will come down prior to end of the supreme court's current term.  For significant portents, see 32 LW 3345.

In these developing circumstances I choose to refrain, again and now, from selection under said paragraph 7 [art 4, § 6] of a most compliant plan.  For my part, as before (372 Mich 448), this Court remains "disabled" from determining which plan complies most accurately with the constitutional requirements.  The reason is that the applicable standard of Fourteenth Amendment equality must be ascertained, as a vital essential of such "constitutional requirements," and that standard is not as yet revealed to us.  Now I would turn to the future, the better to prepare for it no matter what comes next in the way of early or delayed judicial decision.

In his most notable congressional speech, "In Favor of Internal Improvements" (Life and Works of Abraham Lincoln, volume 2, pages 138, 152, 153, Centennary Edition 1907), Mr. *Lincoln* provided an appropriate text for today's presently harried Court:

"Then, difficulty though there be, let us meet and encounter it. 'Attempt the end, and never stand to doubt; nothing so hard, but search will find it out.'  Determine that the thing can and shall be done, and then we shall find the way."

It should be clear by now that, no matter what the apportionment commission and this Court could have done and may yet do, there really never was sufficient time—paragraph 8 of said section 6 stressedly considered—for a *final* determination that any plan stood or stands ready for the nomination and election, *this year,* of members of both houses of the legislature.  The only exception was and yet is a timely and controlling decision of the supreme court.  Where does that leave

---

4 By the supreme court's order of January 6th the printing of the record was dispensed with, the appellants' brief was directed for filing not later than February 11th, and the appellees' brief was directed for filing not later than March 17th.

our State—today? I turn to the Schedule and Temporary Provisions of the Constitution and, noting the first paragraph of section 3 and all of section 5 thereof, record them here for convenience:

"Sec. 3. Except as otherwise provided in this Constitution, all officers filling any office by election or appointment shall continue to exercise their powers and duties until their offices shall have been abolished or their successors selected and qualified in accordance with this Constitution or the laws enacted pursuant thereto."

"Sec. 5. Notwithstanding any other provision in this Constitution, the governor, the lieutenant governor, the secretary of State, the attorney general and State senators shall be elected at the general election in 1964 to serve for two-year terms beginning on the first day of January next succeeding their election. The first election of such officers for four-year terms under this Constitution shall be held at the general election in 1966."

If it were not for quoted section 5 and its "notwithstanding" mandate, failure to reach a timely determination of finality, under said paragraphs 7 and 8,[5] would bring quoted section 3 into pertinent play. The due result then would be that all present legislative officers should continue to exercise the powers and duties of their offices until their successors are elected "in accordance with this Constitution or the laws enacted pursuant thereto." Section 5 thus appears to be a present stumbling block against legislative continuity; continuity until the provisions of said section 6 (of article 4) can be carried into final legal effect. Yet upon due reflection it is perfectly clear that quoted section 5, although supreme of mandate, is not self-executing.[6] Indeed, we know now—and also why—the mandate cannot be carried into effect, so far as concerns senatorial elections in 1964, unless of course litigatory luck should attend this Court and its coming experience under paragraph 8 of said section 6. Thus it seems to me that, if no other way to orderly senatorial elections this year is adjudicated in time, then quoted section 5 can—no, must—be disregarded pertinently on account of its unimplemented character and on account of impossibility of compliance therewith. That would leave the quoted first paragraph of section 3 in full effect for today's quandary and solution thereof if solution becomes necessary. Such effect unaided by legislation would carry over, into 1965 and possibly 1966, the offices as well as the duties of all present legislative officers, until their successors under the new Constitution have been duly elected and qualified.

More to the point will have to be said, depending upon imminent developments, yet the foregoing is sufficient to show that there is a way out should currently muttered political imprecations find support in ensuing events. It is possible that, by denial of certiorari in the second *Scholle Case,* or by termination of the stay order of July 27, 1962 (see 367 Mich at 179), other measures may come to fair consideration. Whatever the fact in such regard, it is the duty of a Court such as ours to see that the ship of State sails on as before. And it is plain that courts can always find a way that is right, no matter how difficult that may be, when there is a will so to do.

---

[5] The reference is to paragraphs 7 and 8 of section 6 of article 4.

[6] For the standard and accepted tests that are determinative of what is and what is not a self-executing constitutional provision, see *Hamilton* v. *Secretary of State,* 227 Mich 111, and *City of Detroit* v. *Oakland Circuit Judge,* 237 Mich 446; also 11 Am Jur, Constitutional Law, § 74, pp 691, 692.

I agree with Justice ADAMS. We should abstain at present from making a selection under said paragraph 7. Doing so Justice ADAMS and the writer follow the lead of the district court in the Nebraska apportionment case of *League of Nebraska Municipalities* v. *Marsh* (DC Neb), reported initially in 209 F Supp 189. Recently, under date of March 3d, that court, having reheard the matter on reserved jurisdiction, issued a per curiam order concluding as follows:

"The case was tried to the court, each of the parties introduced evidence and briefs were filed by the parties. A decision has been withheld awaiting a possible guiding decision by the United States supreme court in 1 or more of the reapportionment cases heretofore submitted to it. None have been announced and since 1 or more cases are to be submitted to the court at a coming session it seems probable that further decisions will not be forthcoming prior to the final date for the filing for nomination in the legislative districts.

"It would seem both inadvisable and undesirable for us to speculate upon the decision of the United States supreme court and enter a final and appealable order herein even though an appeal could then be taken to the United States supreme court.

"We conclude to take no action until further guide lines have been announced."

This surely is no time for constitutional determinations at uninformed half-cock, or for decisional divisions according to Republican or Democratic nominations to the Court. Enough of that is before us as we peruse the staunchly supported plan of the 4 Republican members of the apportionment commission, the correspondingly supported plans of the 4 Democratic members of that commission, and now the straight party-line adoption—by 3 members of this Court—of the Republican plan. A grave constitutional question must be answered before we may, with the propriety owing a solemn oath of high office, decide which of these frankly partisan plans complies most accurately with the constitutional requirements. That question—concededly and exclusively Federal in nature—can be answered, dependably, only by the highest court of the land. It is due for imminent answer, as all signs tell us, by that court. That court is not one which, historically, delays its decisions very long following oral argument. Why, then, this stampede for recording of party devotion along with judicial selection under said paragraph 7? Looking again at the constitutional schedule, the declared purpose of which is "To insure the orderly transition from the Constitution of 1908 to this Constitution," is today's headlong rush really necessary?

SMITH, J. I concur with Mr. Justice ADAMS but would add these few words. If I were convinced that election chaos would result from reasonable adjournment then I would not hesitate to take all steps, within my power, to prevent it, and now. However, I can read election timetables like anyone else. There would still be time to set up election machinery if we adjourned decision until approximately May 15, 1964. Beyond that date we will approach a point of criticality which if not solved by United States supreme court decision, will require appropriate action from this Court. Whatever is necessary and proper, I shall be prepared to do.

KAVANAGH, C. J. For the reasons set forth in my opinions in the 2 *Scholle Cases*[1] and the reasons given by Justice SOURIS in his present

---

[1] *Scholle* v. *Secretary of State,* 360 Mich 1; *Scholle* v. *Secretary of*

opinion, I concur in the conclusion reached by him, that no plan. submitted meets the "constitutional requirements."2

However, due to the imminence of further decisions by the United States supreme court in the 6 cases cited by Justice ADAMS as presently before it for decision, I conclude we cannot with propriety act: before these decisions are released.

---

*State,* 367 Mich 176 (on remand from the United States supreme court, 369 US 429 [82 S Ct 910, 8 L ed 2d 1]).

2 Constitution 1963, art 4, § 6, provides: "The Supreme Court shall determine which plan complies most accurately with the constitutional. requirements and shall direct that it be adopted by the commission and published as provided in this section."

---

Hanna-Huhtala-LaPorte-Brucker plan of apportionment approved and directed to be published by DETHMERS, KELLY, SMITH, O'HARA, and ADAMS, JJ., upon concurrence in result on May 26, 1964, by SMITH and ADAMS, JJ., who subject their approval to reservation as to constitutionality under the Federal Constitution.

SMITH, J. During the April session of the Court, having already waited a month since submission of this cause, I made up my mind that if by May 18th[1], at the latest, no definitive decision had been received. from the supreme court of the United States on State legislative apportionment I would join other willing members of this Court in adopting a plan submitted. by members of the apportionment commission. In: a brief prior opinion, I said that it was my calcula- tion that about May 15th we would be approaching a point of criticality in regards to legislative elec- tions constitutionally scheduled for November, 1964..

This calculation was and is based upon timetables: in the Michigan Constitution of 1963. From these schedules arise certain problems inherent in any orderly election process. Basically, the problems. have to do with time. Once the Court approves a plan, time is required for the apportionment com- mission to publish; time is constitutionally permitted. for an elector to attack the plan[2]; after that, time is. necessary for consideration of the elector's objec-

---

[1] An opinion day of the supreme court of the United States..

[2] Art 4, § 6, paragraph 8.—REPORTER.

tions, if any; further, time is required for decision; time may be required for dissent; any final order will require time in which to make it operative. By then, at a very minimum, all time will be used up, if we contemplate an orderly election process under the Constitution. I can contemplate nothing else.

Time is also necessary to other important objectives. Of greatest importance is the time necessary to acquaint the citizen-voter with legislative districts, house and senate, in which he resides. Candidates for these offices, in both the primary and the general election, need to know their districts in sufficient time so as to be able to acquaint the electorate with the issues and with their qualifications.

With this in mind then, I must concur, now, in the results reached by Justice DETHMERS in his opinion filed some 2 months ago. Concurring in results only, obviously I do not subscribe to all of his reasons. To this much I do subscribe: that the so-called Republican plan most accurately complies with article 4 of the Constitution of 1963. That it does, should surprise no one. The results were probably foretold in the constitutional convention. As an institution organized along partisan lines, it accomplished a partisan result in its apportionment formulae. Any plan adopted pursuant thereto had its result largely preordained. This is neither good nor bad, necessarily; it is but an example of the use of political power. In any event, who runs in what district, and what the political composition of such district may be are of legitimate concern elsewhere, but not in the courts. The duty here is to measure the results in terms of basic legal guidelines. This is what I have done within the frame of reference, however, of the Michigan Constitution only.

I have not attempted to measure the plan and formulae by the equal protection clause of the Fourteenth Amendment. Judgment on that issue, I re-

serve. Nobody knows, at this writing, what the equal protection clause requires in the makeup of a bicameral legislature of a State. As so often mentioned in these proceedings, that question is presently before the supreme custodian of the Federal Constitution. When the matter is decided by the highest authority, no one will be quicker to subscribe than I. But until the high court speaks, the matter is still debatable. Government must go on, and, therefore, the presumption of validity must be indulged until contrary advice is received.

Time no longer permits the luxury of anticipating either when or what the supreme court of the United States will decide. What is before us is a more immediate and practical necessity. Having waited in good faith this long for further direction, I now take this action in the interest of orderly processes by concurring in the results reached by Justice DETHMERS.

ADAMS, J. I join in the finding of Justices DETHMERS, KELLY, O'HARA, and SMITH that, under section 6, art 4, of the Constitution of 1963, the Hanna plan complies most accurately with the requirements of said Constitution and that said plan shall be adopted by the commission on legislative apportionment and published as provided in section 6, art 4, Constitution of 1963.

I agree with Justice SMITH in his analysis of the time problems which presently exist in terms of orderly election processes, and that it is highly desirable the 60 days permitted for the application of an elector with respect to the plan begin to run. It is because of the exigencies of the situation that I have decided to cast my vote at this time. However, in doing so, I reserve for future consideration any question as to the constitutionality of the Hanna plan under the Constitution of the United States.